IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BEIJING CHOICE ELECTRONIC<br>TECHNOLOGY CO., LTD.,<br><br>    Plaintiff,<br><br>    v.<br><br>CONTEC MEDICAL SYSTEMS USA INC. and<br>CONTEC MEDICAL SYSTEMS CO., LTD.,<br><br>    Defendants. | Case No.: 18-cv-00825<br>Judge Franklin U. Valderrama<br>Magistrate Judge Susan E. Cox |

**<u>DEFENDANTS' AMENDED MOTION FOR SANCTIONS</u>**

**PUBLIC VERSION**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................1

II. CHOICE AND ITS COUNSEL ENGAGED IN SANCTIONABLE MISCONDUCT ..............................................................................................................2

    A. Contec Recently Learned That Choice's Counsel Withheld Forged Documents For Seven Months Before Introducing Them At Mr. Hu's Deposition .........................................................................................................2

    B. Choice's Counsel Repeatedly Scolded, Berated, And Insulted Mr. Hu And Otherwise Engaged In Grossly Unprofessional Deposition Conduct ......................6

    C. Choice Waited Until *After* Contec Filed Its Opposition To Choice's Renewed Sanctions Motion To Disclose The Source And Timing Of The Forgeries .........................................................................................................8

III. LEGAL STANDARD....................................................................................................9

IV. CHOICE AND ITS COUNSEL DELIBERATELY ENGAGED IN BAD FAITH CONDUCT TO FRUSTRATE THE FAIR EXAMINATION OF JAMES HU ...............10

    A. Choice And Its Counsel Procured Falsified Evidence Which They Withheld For *Seven Months* And Sprung On The Witness At His Deposition .....................10

    B. Choice's Counsel Engaged In Bad Faith Conduct That Warrants Sanctions ........13

V. CONCLUSION............................................................................................................15

## I. INTRODUCTION

In January 2022, Choice frustrated the fair examination of Contec's corporate witness, Mr. James Hu, by introducing forged documents, misrepresenting their source, misrepresenting when Choice obtained them—Choice withheld the forged documents from Contec for seven months and sprung them on Mr. Hu in his deposition last month—and harassing, berating, and abusing Mr. Hu in a manner unbefitting the legal profession. Choice then relied on testimony obtained unfairly in that same deposition as the primary basis for its renewed sanctions motion.

More particularly, on the first day of Mr. Hu's deposition, Choice introduced never-produced sales documents, purportedly showing sales of the accused products in 2020, more than two years after Contec discontinued selling them in the U.S.. When Mr. Hu did not recognize the documents, Contec immediately undertook an investigation into the source of these documents—an investigation that was hampered by Choice's misrepresentations at the deposition as to how and when Choice obtained the forged documents. Although Choice's counsel represented that Choice had only just received the documents from Contec's customer, ▓▓▓▓ Contec later confirmed that ▓▓▓▓ had no record of the documents and that they were in fact forgeries.

Contec continued its investigation by serving an amended Rule 30(b)(6) deposition notice on February 4, 2022, seeking testimony regarding Choice's acquisition of the forged documents. On February 21, 2022, two days before the deposition and after Contec independently confirmed that Choice misrepresented the documents' source, Choice served objections, refusing to provide a witness on this topic. Contec requested a meet-and-confer, after which Choice amended its objections, disclosing that it had received the forged documents from an unknown Amazon seller—not ▓▓▓▓—*seven months* before the deposition. Choice designated Mr. Lawrence Wang as its corporate witness on the topic related to the forged documents, yet Mr. Wang could provide no evidence that Choice or its counsel made any effort to authenticate these documents during the

1

time Choice withheld them. Choice improperly surprised Contec's witness, a foreign national who required a translator at his deposition, with the forged documents, leaving the witness "trap[ped]" and concerned he was being "manipulat[ed]" for the remainder of his deposition. (Dkt. 278-2, Deposition Transcript of James Hu Volume I, 85:5-86:6.)

Additionally, Choice's counsel repeatedly harassed, berated, criticized, and insulted Mr. Hu throughout the deposition—conduct deemed "unacceptable" in this district. *United States v. Warden*, 302 F.R.D. 256, 258-59 (N.D. Ill. 2014). In the face of this onslaught, Mr. Hu naturally resorted to defending himself: explaining that he was telling the truth when counsel called him a liar and requesting that Mr. Rosenfeld not "deviate" Mr. Hu's testimony from the original meaning he intended to convey during this two-day translated deposition. (Dkt. 278-3, Deposition Transcript of James Hu Vol. II, 249:18-250:1.)

The Court should send a send a clear message that it will not condone counsel, here counsel for Choice, attempting to prop up its damages case by using forged documents, and impose sanctions to deter similar future conduct. Contec therefore moves for sanctions against Choice and its counsel in the form of the following relief: (1) precluding Choice from relying on the second volume of Mr. Hu's deposition transcript; (2) precluding counsel Mr. Stephen Rosenfeld from examining or cross-examining Mr. Hu at trial; and (3) monetary sanctions, including attorneys' fees and costs, for both defending Mr. Hu's second day of deposition and for bringing this motion.

## II. CHOICE AND ITS COUNSEL ENGAGED IN SANCTIONABLE MISCONDUCT

### A. Contec Recently Learned That Choice's Counsel Withheld Forged Documents For Seven Months Before Introducing Them At Mr. Hu's Deposition

Over the course of two days, January 6-7, 2022, Choice deposed Contec's corporate representative, Mr. James Hu. The transcripts from that deposition were previously submitted to the Court at Dkt. 278-2 ("Hu Tr. I") and 278-3 ("Hu Tr. II"). During the first day, Choice's counsel,

2

Mr. Stephen Rosenfeld, introduced two previously-undisclosed documents purporting to show U.S. sales of the accused products in 2020, long after Contec discontinued those products in 2018. (Hu Tr. I, 77:5-10, 83:3-12; Ex. A; Ex. B.) When Contec's counsel asked where such apparently confidential documents were obtained and why they were not previously produced, Choice's counsel refused to answer. (Hu Tr. I, 78:3-79:4.) Pressed further, Mr. Rosenfeld stated that Choice "just got these documents" from the Contec customer identified in the documents, ▮:

> MR. EUTERMOSER: Well, I'm not sure it's appropriate to put this in front of the witness if you didn't produce it in advance, if you're not going to tell me where it came from.
> MR. ROSENFELD: It came from the customer, ▮.
> MR. EUTERMOSER: Okay. But not pursuant to a subpoena?
> MR. ROSENFELD: Correct.
> MR. EUTERMOSER: Then why wasn't it produced to us as part of the litigation?
> MR. ROSENFELD: Because we just got these documents.
> MR. EUTERMOSER: When?
> MR. ROSENFELD: I'm not getting into that right now.

(*Id.*, 79:5-80:9.)

Even before investigating the source of the documents, Mr. Hu testified that he believed there to be "fraud" involved and was concerned about testifying:

> I definitely have no memory of this at all. What are you trying to get at? What are you trying to get at with these documents? I definitely would not have knowledge about all these documents you're just showing me. But I dare not make a comment about whether these are true authentic documents or false.

(Hu Tr. I, 80:5-81:7 ("INTERPRETER: The witness was just saying this looks like there's a fraud involved.").) Before continuing with the remainder of the first day, Mr. Hu expressed concern that someone was setting "a trap" for him or trying to "manipulat[e] this," because the documents contradicted the fact that Contec stopped selling the accused products in the U.S. two years earlier:

> I have a doubt right now that these documents, including this transaction or business, they involve a trap set up by someone. Otherwise, someone would not have been able to obtain these documents, these original documents, within such a short time. Also, for all of the products we are selling to the United States, they are all auto rotation products. I doubt that somebody is manipulating this. . . . .

3

> Okay. That trap looks imperfect to be truth. And I hope that our attorneys, our counsel, could also participate with us and work with us and look into this and do some investigation because the trap is just too perfect, and I hope that we can look into this to find out the truth.

(*Id.*, 85:5-86:6.)

During the second deposition day, Mr. Hu testified that Contec had no record of the sales documents and believed them to be forgeries. (Hu Tr. II, 131:8-17, 135:21-137:5, 137:15-18.) The shipping information and form did not match Contec's typical format; one contract included a trade term that "clearly [was] not acceptable by Contec;" and the seal appearing on the face of one contract was not Contec's seal for contracts. (*Id.*, 137:18-138:1, 138:16-19.) Even before Mr. Hu's deposition resumed, Contec reached out to the customer identified in the forged documents, ▮, which confirmed it had no record of the purported documents. (*Id.*, 137:2-5, 138:2-6, 138:20-139:6.) And after the deposition, ▮ general manager provided a declaration stating the documents were indeed counterfeit and that ▮ "never signed any contract with Contec regarding ▮ fingertip pulse oximeters." (Ex. C (translated version of Dkt. 284-9, Ex. 2).)

Following the deposition, Contec served an amended Rule 30(b)(6) notice of deposition on February 4, 2022, including a new topic on the forged documents. (Ex. D at No. 31.) Choice served objections to Contec's notice just two days before the deposition of its corporate representative, refusing to designate a witness on this topic. Contec immediately demanded a meet-and-confer, after which Choice amended its response the day before the deposition, on February 22, 2022, agreeing to designate Mr. Lawrence Wang and providing the following new information:

> Plaintiff further represents that an Amazon seller Tesoky contacted Plaintiff's counsel at Bayes PLLC and provided the abovementioned exhibits while attempting to settle an Amazon-takedown request brought by Bayes PLLC, on behalf of Plaintiff, against Tesoky's Amazon listing. That seller claimed its products were not covered by Choice's patents because they were purchased from Contec and thus protected by Contec's patents. They offered these documents as proof of purchase. The documents show purported transactions between Contec and ▮, leading counsel to think ▮ is seller's underlying company. Bayes handled all communications with the seller.

4

(*Id.* at 21.) Choice also produced emails received by its outside counsel—Bayes PLLC—from "Tesoky&Ansinna" (not ▮), to which the forged documents were attached, but produced none of Bayes's own communications. (Exs. E, F, G.) Choice received these emails in May 2021, seven months before Mr. Rosenfeld's representation that Choice "just got" them from ▮.

At Mr. Wang's deposition on February 23-24, 2022, Choice's corporate representative confirmed he had no knowledge of, and was not prepared to testify regarding, the procurement of the forged documents. (Ex. H, Rough Deposition Transcript of Lawrence Wang Volume II ("Wang Tr. II"), 64:6-68:21.) When, during Mr. Wang's deposition, Contec raised concerns about Choice's subversion of the legal process based on Choice's outside counsel's refusal to transmit responsive, nonprivileged information to the witness, Choice's counsel suspended the deposition to "prepare" Mr. Wang regarding the topic of the forgeries during a fifteen-minute break. (*Id.*, 68:18-69:21.) However, despite Choice's designating Mr. Wang on the topic, upon resuming the deposition, it quickly became clear that Choice's counsel prepared Mr. Wang with no more information than was contained in Choice's objection and response. (*Id.*, 68:18-21.) Moreover, Choice's counsel repeatedly made speaking objections that questions were outside the scope of the Rule 30(b)(6) deposition, after which Mr. Wang simply answered that he had no knowledge of the forgeries:



5



(*Id.*, 65:15-66:5, 77:24-78:10, 79:9-25.)

Choice's counsel improperly attempted to testify himself, stating "[t]he only facts are the facts we provided you in writing. There are no other facts." (Wang Tr. II, 67:5-7.) Mr. Wang was unable to answer Contec's questions related to the forged documents including: (1) the identity of "Tesoky&Ansinna;" (2) any efforts Choice made to determine the identity of "Tesoky," where "Tesoky" is located, and whether "Tesoky" had any relation to ▅; (3) any efforts Choice made to verify the source of these documents; (4) who at Bayes received the contracts; and (5) why the documents were sprung on Mr. Hu for the first time seven months later, at Mr. Hu's deposition. (*Id.*, 77:15-79:25.) Mr. Wang was also unable to provide any details related to the Amazon take-down request—the very transaction from which these forged documents purportedly surfaced. (*Id.*)

### B. Choice's Counsel Repeatedly Scolded, Berated, And Insulted Mr. Hu And Otherwise Engaged In Grossly Unprofessional Deposition Conduct

Mr. Hu's deposition transcript contains multiple examples of Mr. Rosenfeld's misconduct, clearly intended to intimidate, badger, harass, and embarrass the witness. (*E.g.*, Hu Tr. I, 25:24-

6

26:3 ("Is it fair to say that you did nothing to learn the details of the sales in the United States…in preparation for this deposition?"), 29:6-7 ("You did nothing to prepare to give me a specific answer to this topic, true?"); Hu Tr. II, 253:19-254:7 ("Mr. Hu, are you saying that you can't remember the question that was just translated to you by the translator? Is your memory that short?"), 254:8-14 ("People forget a question that was just translated to them? . . . . It was translated to him and then he said he doesn't remember. Let me ask him again. Maybe he'll remember this time."), 255:1-11 ("Mr. Hu, if your memory is so short … how are we supposed to believe that you have testified accurately as to any factual information that you gave us during these last two days?"), 258:5-11 ("[Y]our responsibility during this deposition was to remember and testify about Contec's knowledge…So if you can only remember two of three things you learned even two hours before this deposition, how are we supposed to rely upon your testimony at all?").)

Mr. Rosenfeld also relied on disrespectful, sarcastic questioning. (*E.g.*, Hu Tr. II, 249:3-6 ("When did you supposedly meet with Ms. Guo…?"), 250:13-22 ("So what you're telling me, Mr. Hu, is that when I asked you this morning if there were anything – if you discussed anything else with Ms. Guo, which you apparently discussed with her, according to your testimony now, just an hour or so before this deposition, you did not recall, but then seven hours later, after you've spoken with your counsel, you not only recalled that Ms. Guo read these various e-mails, but recalled the e-mails in detail; is that your testimony?"), 252:22-253:6 ("So what logic did you use to conjure up this additional memory?"), 252:1-13 ("Mr. Hu, did you have anything to drink—or any alcoholic beverages to drink this morning or take any prescription drugs this morning before or during your discussion with Ms. Guo?"), 252:14-18 ("When you gave your testimony to your lawyer, your sudden recollection of your discussions with Ms. Guo and then the other things that you remembered….").)

7

Mr. Rosenfeld repeatedly embraced a strategy of intimidating, aggressive, and unprofessional behavior toward opposing counsel and the witness. (*E.g.*, Hu Tr. I, 67:18-68:3 ("But, sir, I'd like you to answer my question, not what you want to put on the record…. No, I'd like you to stop. You're not the attorney. Brian can answer – Brian can object. You are not to speak now."); Hu Tr. II, 254:19-22 ("Yushan….This is not your deposition. You cannot speak."), 257:7-15 ("Mr. Hu, that was exactly your job this entire deposition. Your job this entire deposition was to remember various things about the topics that we presented to you….").)

Mr. Rosenfeld sought not only to intimidate, but also to harass the witness. (*E.g.*, Hu Tr. I, 53:17-19 ("That statement by your lawyers is a false statement because Contec has attempted to sell accused products to retailers, true?"), 95:7-96:4 ("[Y]ou had an obligation to prepare for this deposition and you failed miserably at doing that."); Hu Tr. II, 239:14-21 ("[I]s that what I understood you just testified to? That you lied to me yesterday?"), 240:3-4 ("There is no explanation, Brian. One was a lie, one was not."), 244:23-245:6 ("And that was false testimony; is that correct?"), 250:2-4 ("You lied to me…didn't you?").

C. **Choice Waited Until *After* Contec Filed Its Opposition To Choice's Renewed Sanctions Motion To Disclose The Source And Timing Of The Forgeries**

After Mr. Hu's deposition but before that of its own corporate representative, Choice renewed its motion for sanctions on January 21, 2022, based on Mr. Jason Li's departure. (Dkt. 278.) Choice alleged that Mr. Hu was insufficiently prepared for his deposition, an issue which it had not yet raised and for which it did not meet and confer with Contec. (*Id.* at 5.) In its February 15, 2022 opposition to Choice's renewed motion, Contec highlighted some of the misconduct that is the subject of this Motion and explained its concerns that Mr. Rosenfeld's misconduct was intended to intimidate Mr. Hu and generate support for Choice's renewed motion. (Dkt. 284.)

8

Contec also raised the forged documents, but it was only after its opposition was filed that Choice disclosed it had indeed misrepresented the source of the forged documents, as well as when Choice received them. Choice's February 22, 2022 response to Contec's deposition notice (disclosing the source of the documents and confirming Mr. Rosenfeld's first misrepresentation), February 23, 2022 production of emails (divulging that Choice withheld the documents for seven months before surprising Mr. Hu with them and confirming Mr. Rosenfeld's second misrepresentation), and Mr. Wang's February 24, 2022 deposition (revealing that Choice failed to investigate the source of the forged documents, and refused to prepare Mr. Wang to testify about them) confirmed that Contec's concerns about the forgeries were well-founded.

### III. LEGAL STANDARD

"'In general, counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer.'" *United States v. Warden*, 302 F.R.D. 256, 258-59 (N.D. Ill. 2014) (quoting Advisory Committee Notes to 1993 Amendments to Rule 30(d)(3)). Federal Rule of Civil Procedure 30(d)(2) "permits an 'appropriate sanction—including reasonable expense and attorneys' fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent.'" *Id.* (quoting Fed. R. Civ. P. 30(d)(2)). Furthermore, "[p]ursuant to 28 U.S.C. Section 1927, '[an] attorney…who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'" *Id.* at 259 (quoting 28 U.S.C. Section 1927). "Finally, 'district courts have broad discretion in supervising discovery, including whether and how to sanction…misconduct.'" *Id.* (quoting *Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012)).

**IV.     CHOICE AND ITS COUNSEL DELIBERATELY ENGAGED IN BAD FAITH CONDUCT TO FRUSTRATE THE FAIR EXAMINATION OF JAMES HU**

Choice's counsel introduced previously-undisclosed, forged documents at Mr. Hu's deposition, despite having the documents for *seven months*, and harassed, intimidated, and berated Mr. Hu throughout two days of his translated deposition. This misconduct frustrated the fair examination of Mr. Hu, naturally requiring the witness (a foreign national unfamiliar with the U.S. court system who required a translator at the deposition) to defend himself, defend his reputation, and beware of any "trap" or "manipulat[ion]" by counsel during his deposition. (*See* Hu Tr. I, 85:5-86:6.) Counsel's persistent berating and lecturing also improperly lengthened the deposition.

Not only should Choice's renewed sanctions motion be denied, Choice and its counsel should also be sanctioned in the form of: (1) precluding Choice from relying on the second volume of Mr. Hu's deposition transcript at trial; (2) precluding Mr. Rosenfeld from examining or cross-examining Mr. Hu at trial; and (3) requiring Choice and/or its counsel to pay for Contec's attorneys' fees and costs associated with both defending the second day of Mr. Hu's deposition and bringing this motion. *Oil-Dri Corp. of Am. v. Nestle Purina PetCare Co.*, No. 15 C 1067, 2018 WL 4976813, at *5-7 (N.D. Ill. Oct. 15, 2018) (awarding monetary sanctions where defendant withheld third-party documents from plaintiff until the day of deposition); *Warden*, 302 F.R.D. at 261-67 (awarding attorneys' fees and costs and precluding the sanctioned attorney from further examining the witness based on numerous instances of "inappropriate, insulting, and offensive remarks and questions" and "disrespectful, sarcastic questions" by counsel).

**A.     Choice And Its Counsel Procured Falsified Evidence Which They Withheld For *Seven Months* And Sprung On The Witness At His Deposition**

The limited information Choice has shared with Contec confirms that Choice—at best—obtained forged documents from a third party, took a head-in-the-sand approach by failing to confirm the authenticity or source of the documents, waited seven months to spring the

10

unauthenticated documents on Contec's corporate witness, misrepresented the source of the forged documents during Mr. Hu's deposition, and, finally, misrepresented during Mr. Hu's deposition when Choice obtained the forged documents. (Section II.A, *supra*.) In doing so, Choice violated its discovery obligations and frustrated the fair examination of Mr. Hu.

*Oil-Dri* is instructive. There, the defendant withheld relevant documents until just before a third-party deposition. 2018 WL 4976813, at *5-7. In granting the plaintiff's motion for sanctions under Rule 30(d)(2) and the Court's inherent powers, the Court noted that the plaintiff "was entitled to have received and reviewed all of the [third-party] documents in advance of [the] deposition." *Id.* at *6. Mr. Rosenfeld falsely represented that Choice had only "just" received the forged documents from Contec's customer, ▇. (Hu Tr. I, 79:5-80:9.) To the contrary, Choice received the forged documents **seven months** earlier, in May 2021, from an Amazon seller. (Ex. D at 21; Ex. G.) Those documents were responsive to at least Contec's RFP Nos. 1, 3, and 20, yet Choice never produced them and never sought to verify the source, details, or authenticity of the documents with Contec. Indeed, Choice itself deemed these documents important to its damages case-in-chief—contending during the deposition that the forged documents represented Contec's continued sales of accused products years after it stopped selling the accused products.

Choice's attempt to cover up the forgeries and its complicity in deliberately relying on them did not end there. In its response to Contec's Rule 30(b)(6) notice, Choice claimed that the Amazon seller's provision of alleged contracts between Contec and ▇ led "counsel to think ▇ is seller's underlying company." (Ex. D at 21.) But nothing in the forged documents suggested ▇ and Tesoky are related in any way. (Wang Tr. II, 78:12-79:6.) Moreover, the Tesoky email came from an account provided by 163.com, a domain similar to Gmail where anyone can set up an account. (*Id.*, 72:5-14; Exs. E, F, G.) Further, the email transmitting the

11

forged documents to Choice is suspicious on its face—it contains no content whatsoever, despite transmitting documents to a law firm. Nothing in the 163.com email, or any other document produced by Choice, supports Choice's allegation that it "believed" Tesoky and ▇ to be related in some way or justifies Choice's use of forged documents at Mr. Hu's deposition. (Ex. G; Wang Tr. II, 70:22-71:1.) As detailed in *Kotsilieris v. Chalmers*, Choice's decision to "[p]lay[ ] ostrich," put its head in the sand, and not investigate the questionable source of these forged documents qualifies as indifferent conduct amounting to objective bad faith. 966 F.2d 1181, 1185 (7th Cir. 1992).

Mr. Hu was justifiably concerned when confronted with never-disclosed forgeries that contradicted his personal and corporate knowledge that Contec discontinued sales of the accused products in the U.S. in early 2018. Mr. Hu, a Chinese national unfamiliar with the U.S. legal system and the obligations of opposing counsel to abide by certain standards of ethical conduct, felt this was an attempt to "trap" him—and indeed, based on Choice's response to Contec's Rule 30(b)(6) notice and Mr. Wang's testimony, Mr. Hu's instincts were correct. (Hu Tr. I, 80:15-81:7, 85:8-86:6; Hu Tr. II, 131:8-17.) Mr. Hu previously explained that, after being presented with the two forged documents during the first day of deposition, he entered the second day of deposition feeling "strongly that Choice was trying to trap [him] with false evidence, and [he] was concerned about this possibility for the remainder of the deposition." Dkt. 284-10, Hu Decl., ¶ 16. By recklessly procuring and surprising Contec's corporate witness with forged documents, Choice frustrated the fair examination of Mr. Hu—particularly during the second deposition day—and should be precluded from relying on the second-volume transcript at trial. Fed. R. Civ. P. 30(d)(2).

Furthermore, Choice and its counsel's decision to withhold forged documents for seven months, avoid investigation as to their authenticity and source, and then introduce these documents

12

as evidence supporting its damages case in a deposition was "an improper tactical attempt to hinder" Contec during the deposition, similar to the sanctionable conduct at issue in *Oil-Dri*. Choice and its counsel's conduct here warrants sanctions in the form of expenses and attorneys' fees incurred both in conducting the deposition and in briefing this motion for sanctions. *Oil-Dri*, 2018 WL 4976813, at *5 (citing *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) ("[A] district court's inherent power to sanction for violations of the judicial process is permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court.").

### B. Choice's Counsel Engaged In Bad Faith Conduct That Warrants Sanctions

There is no excuse for Mr. Rosenfeld's misconduct at Mr. Hu's deposition. *Warden*, 302 F.R.D. at 261-67 ("Where there is a breakdown of decorum at a deposition, a court should use 'its authority to maintain standards of civility and professionalism.'") (quoting *Redwood v. Dobson*, 476 F.3d 462, 469 (7th Cir. 2007)). The *Warden* court reviewed an attorney's similar misconduct in the Northern District of Illinois, awarding monetary sanctions for counsel's "repeated improprieties during [the] deposition" and precluding that attorney from attending or conducting the witness's continued deposition. *Id.* at 267-268. The attorney in that case resorted to "numerous instances of inappropriate, insulting, and offensive remarks and questions," (*id.* at 262 (*e.g.*, "Did you have any common sense?")); "other disrespectful, sarcastic questions," (*id.* (*e.g.*, "You understand English, right?")); "aggressive and threatening behavior toward opposing counsel and [the witness]," (*id.* at 264 (*e.g.*, "You are going to have to answer my question sooner or later.")); and "intimidating and harassing conduct" (*id.* at 266 (accusations of HIPPA violations)).

Mr. Rosenfeld's conduct exceeds the misconduct sanctioned in *Warden*. Mr. Rosenfeld repeatedly made unnecessary, insulting remarks regarding the witness's memory. (*E.g.*, Hu Tr. II, 253:19-254:7 ("Mr. Hu…Is your memory that short? That's your testimony?"), 254:8-14 ("Let me

13

ask him again. Maybe he'll remember this time."), 255:1-11 ("Mr. Hu, if your memory is so short…how are we supposed to believe that you have testified accurately as to any factual information that you gave us during these last two days?"), 258:5-11 ("So if you can only remember two of three things you learned even two hours before this deposition, how are we supposed to rely upon your testimony at all?"); *see also* Section II.B, *supra*.) Mr. Rosenfeld asked disrespectful and sarcastic questions, including whether Mr. Hu was under the influence of drugs or alcohol. (*E.g.*, Hu Tr. II, 252:22-253:6 ("So what logic did you use to conjure up this additional memory?"), 252:1-13; *see also* Section II.B, *supra*.) As the *Warden* court found, "[s]uch conduct is obviously not appropriate." 302 F.R.D. at 262.

Mr. Rosenfeld further engaged in aggressive, unprofessional behavior toward opposing counsel, lecturing the associate serving as a check translator during the two-day translated deposition. (*E.g.*, Hu Tr. I, 67:18-68:3 ("But, sir, I'd like you to answer my question, not what you want to put on the record…No, I'd like you to stop. You're not the attorney. Brian can answer – Brian can object. You are not to speak now."); Hu Tr. II, 254:19-22 ("This is not your deposition. You cannot speak."). He also lectured the witness. (Hu Tr. I, 95:7-96:4 ("[Y]ou had an obligation to prepare for this deposition and you failed miserably at doing that."); Hu Tr. II, 257:7-15 ("Mr. Hu, that was exactly your job this entire deposition. Your job this entire deposition was to remember various things…."); Section II.B, *supra*.) "[A]rguing with the witness and commenting on [his] answers, is inappropriate and unprofessional." *Warden*, 302 F.R.D. at 264-265.

Just as occurred in *Warden*, Mr. Rosenfeld's "question[s] amounted to a personal attack on [the witness] by calling [him] a liar." *Warden*, 302 F.R.D. at 261; *e.g.*, Hu Tr. II, 239:14-21 ("[I]s that what I understood you just testified to? That you lied to me yesterday?"), 240:3-4 ("There is no explanation, Brian. One was a lie, one was not."), 244:23-245:6 ("And that was false testimony;

14

is that correct?"), 250:2-4 ("You lied to me when you told me that you only spoke with Nadia Guo about two things this morning, didn't you?"). "While counsel is entitled to explore truthfulness, he should not have resorted to personally attacking the deponent." *Warden*, 302 F.R.D. at 261.

The apparent purpose of counsel's questions and commentary was to intimidate and harass the witness, frustrating the fair examination of Mr. Hu by creating a hostile and intimidating deposition setting. At one point, so frustrated with counsel's mischaracterizations of his testimony, Mr. Hu stated "you cannot use your advantage and training as an attorney to try to deviate my testimony from the original meaning I intended to convey." (Hu Tr. II, 249:21-24.) Mr. Hu felt compelled to defend himself, repeatedly confirming his testimony was the truth and that he was a truthful person. (*Id.*, 242:24, 245:4-6, 245:21-22, 249:18-250:1, 256:10-13; Hu Tr. I, 55:7-11.) Because Choice's counsel frustrated the fair examination of Mr. Hu and because the majority of Mr. Rosenfeld's misconduct came during the second day of deposition, Choice should be precluded from relying on the second day of Mr. Hu's deposition transcript at trial, and Mr. Rosenfeld should be precluded from examining or cross-examining Mr. Hu at trial.

### V. CONCLUSION

Based on the foregoing, Contec requests that Choice and its counsel be sanctioned in the form of: (1) precluding Choice from relying on the second volume of Mr. Hu's deposition transcript at trial; (2) precluding Mr. Rosenfeld from examining or cross-examining Mr. Hu at trial; and (3) requiring Choice and/or Choice's counsel to pay Contec's attorneys' fees and costs associated with defending the second day of Mr. Hu's deposition and bringing this motion.

| | |
|---|---|
| Dated: March 9, 2022 | */s/ Christopher C. Campbell* <br> Christopher C. Campbell (*pro hac vice*) <br> ccampbell@kslaw.com <br> Yushan Luo (*pro hac vice*) <br> yluo@kslaw.com <br> **King & Spalding LLP** <br> 1700 Pennsylvania Ave., NW, Suite 200 <br> Washington, DC 20006-4707 <br> Tel: (202) 626-5578 <br> Fax: (202) 626-3737 <br><br> Brian J. Eutermoser (*pro hac vice)* <br> beutermoser@kslaw.com <br> **King & Spalding LLP** <br> 1515 Wynkoop Street, Suite 800 <br> Denver, CO 80202 <br> Tel: (720) 535-2312 <br> Fax: (720) 535-2400 <br><br> Allen E. Hoover IL 06216256 <br> ahoover@fitcheven.com <br> Joseph F. Marinelli <br> jmarinelli@fitcheven.com <br> **Fitch, Even, Tabin & Flannery LLP** <br> Suite 2100 <br> 120 South LaSalle Street <br> Chicago, Illinois 60603 <br> Tel: (312) 577-7000 <br> Fax: (312) 577-7007 <br><br> *Attorneys for Defendants Contec Medical Systems USA Inc. and Contec Medical Systems Co., Ltd.* |

**CERTIFICATE OF SERVICE**

I certify that on March 9, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification. I further certify that I caused a copy of this document to be mailed by first-class mail to all non-CM/ECF participants.

*/s/ Christopher C. Campbell*